# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 19, 2011

## STATE OF TENNESSEE v. DARIUS DARRELL LEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1837      Monte Watkins, Judge**

_____

**No. M2010-00057-CCA-R3-CD - Filed December 22, 2011**

_____

A Davidson County jury convicted the defendant, Darius Darrell Lee, of three counts of aggravated robbery, Class B felonies. The trial court sentenced him as a Range I, standard offender to an effective sentence of twenty-two years in the Tennessee Department of Correction. The defendant filed an untimely motion for new trial and untimely notice of appeal. The State urges this court to dismiss the appeal; however, we have chosen to waive the untimely notice in the interest of justice to consider the defendant's arguments regarding the sufficiency of the evidence and sentencing, which are not waived by an untimely filing of a motion for new trial. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Eugenia R. Grayer (on appeal), and Katie Bottom-Weiss and Jonathan Augusta (at trial), Nashville, Tennessee, for the appellant, Darius Darrell Lee.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Debbie Housel and Leticia Alexander, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On June 19, 2007, a Davidson County Grand Jury indicted the defendant, along with two co-defendants, on three counts of aggravated robbery, Class B felonies. The charges

stemmed from the March 22, 2007 robbery of three Belmont University students: Will Lindberg, Kathleen McCrary, and Sara Pecchia. The matter proceeded to trial on April 13, 2009.

At trial, Will Lindberg testified that on March 22, 2007, he rode with Sara Pecchia and Kathleen McCrary to a Steak and Shake restaurant to celebrate a friend's birthday. Ms. Pecchia drove. They arrived at the restaurant between 10:00 and 10:30 p.m. He said that after an hour, McCrary began feeling ill, so he, Pecchia, and McCrary decided to leave the celebration early. As they walked to Pecchia's car, which she had parked in a lot adjoining the restaurant, they heard someone behind them say, "Hey, give me some money." Lindberg said that he thought a panhandler was asking for money until the man asked, "Do you think this is a fucking joke?" Lindberg testified that he turned around and saw that the man had a silver semi-automatic gun. Lindberg identified the defendant in the courtroom as the person who demanded their money. He testified that the defendant was wearing a black do-rag, black shirt, baggy pants, and a gray hoodie. Lindberg said that the defendant told him to give him his wallet, so he removed his wallet from his back pocket and threw it on the ground in front of the defendant. The defendant demanded that Lindberg pick up the wallet, but he refused. Lindberg testified that the defendant grabbed the wallet, and Pecchia began calling their friends inside of the restaurant.

Lindberg said that another man got out of the backseat of a Jeep Cherokee. The second man displayed a black semi-automatic gun and took Pecchia's phone and purse and McCrary's purse. Lindberg said that he had not noticed the Cherokee before the man jumped out of it. He testified that the defendant continued to point a gun at him while the second man was taking the women's purses. Lindberg testified that the second man was wearing a black shirt with a shiny gold pattern on it, but he did not notice the man's facial features. Lindberg identified Exhibit 1-A as a photograph of the second man, who took the women's purses, but he did not recognize anyone in the courtroom as being the second man. He identified Exhibit 1-B as a photograph of the defendant, who held a gun on him and took his wallet. Lindberg testified that after the men took their belongings, the men got into the Jeep Cherokee, and a third person drove the Cherokee away. He said he had not realized that a third person had been in the Cherokee until that point. Lindberg called the police from his cell phone. When the police arrived, they spoke to the three of them separately. The police took Lindberg in a police vehicle to a carwash. The police took the women to the carwash, also, but in a second police vehicle. At the carwash, the police shined a spotlight on the men they had found and asked Lindberg to identify them. Lindberg testified that he was able to identify the defendant. He said that the women received their purses and cell phones from the police, but he never recovered his wallet.

Kathleen McCrary testified that on March 22, 2007, she, Sara Pecchia, and Will Lindberg rode together in Pecchia's car to a Steak and Shake restaurant to celebrate a friend's birthday. She said that she was not feeling well, so the three of them left the celebration early and returned to Pecchia's car, which was parked in a Target parking lot adjacent to the restaurant. McCrary testified that as they walked to the car, she heard a young man yell at them, asking for money. As they continued to walk, the man made "more serious threats," and Mr. Lindberg "tried to confront that, by having us continue to go to the car and . . . [he] tried to throw his wallet down[.]" She said that the man had a silver gun and was wearing a gray hoodie and black toboggan. McCrary testified that a second man got out of a white Jeep Cherokee and took Pecchia's phone out of her hand and her purse. McCrary testified that the second man approached her and took her purse, which contained her cell phone and wallet. She said that the second man had a black gun, which "was very close to [her] face," and was wearing black clothing. She said that the two gunmen got into the Jeep, and a third person drove them away.

McCrary further testified that Lindberg called the police, and the officers who responded placed Lindberg in the back of one police vehicle while she and Pecchia got into the back of a second police vehicle. The police drove them to a carwash and brought three men, one at a time, into a lighted area. McCrary explained that the police had a spotlight on the men, and she understood that the men would not be able to see them in the police cars. She testified that she positively identified the defendant, but she said that she recognized the faces of the other two men without being able to make a positive identification.

Sara Pecchia testified that she had organized a birthday party for a friend at Steak and Shake. She drove her vehicle to the restaurant, and Will Lindberg and Kathleen McCrary rode with her. The three of them left the restaurant just before midnight because McCrary was not feeling well. As they walked back to Pecchia's car, which she had parked in the Target parking lot next to the restaurant, a man yelled at them to give him their money. Pecchia said that the man approached them from behind. She testified that they all turned around, and Lindberg threw his wallet at the man's feet. Pecchia said that she got out her cell phone and began trying to call her friends who were still inside the restaurant, but a second man put a gun to her head and told her to drop her phone. She could not see the second gunman's face, but he took her purse and McCrary's purse. She recalled being especially concerned about her purse because her passport was inside. Pecchia identified Exhibit 1-B as a photograph of the defendant, and she testified that he was the first gunman. Pecchia further testified that the police took her and the other two victims to a carwash. She said that the police presented three suspects, one at a time, and she and the other victims identified the defendant and "felt strongly" about one of the other suspects. Pecchia said that the police returned her purse and phone to her that night.

Nashville Metropolitan Police Officer Brandon Frith testified that he was working as a patrol officer on March 22, 2007, when he responded to a robbery call at 5426 Target Drive. He spoke with the victims who gave descriptions of the two gunmen, the property they took, and the vehicle they were in. He testified that the victims were very distraught. Approximately thirty minutes after he responded, he received information that other officers had located the possible suspects. He drove McCrary and Pecchia to a carwash for a show-up identification, and another officer drove Lindberg to the same place. Officer Frith testified that the victims positively identified the defendant but not the other two men. The women also identified their property.

Nashville Metropolitan Police Officer Jason Mayo testified that he responded to the carwash to assist the officers who had detained the suspects. He helped keep the suspects separated. Officer Mayo testified that he had the defendant in custody and searched the defendant's person, recovering a zebra print cell phone from one of the defendant's pockets. The state asked Officer Mayo to identify the defendant in the courtroom. He identified someone but the record does not reflect who that person was.

Nashville Metropolitan Police Detective Corey Wall testified that on March 22, 2007, he was working as a flex officer in the South Precinct. He explained that flex officers would saturate an area that was experiencing problems and respond to offenses in progress. On March 22, 2007, he testified that he heard dispatch send patrol officers to Target Drive in response to a robbery at the Steak and Shake restaurant. Dispatch also notified officers that the suspects had fled in a white Jeep Cherokee. He said that he proceeded to the general area and began looking for white Jeeps. After Officer Frith received more information from the victims, he relayed the information to Detective Wall and other officers. Detective Wall testified that approximately ten to twelve minutes after receiving Officer Frith's information, he observed a black male in a hoodie pumping gas into a white Jeep at a gas station that matched the description given by Officer Frith. He said that he followed the white Jeep when it left the gas station, and the person driving the Jeep immediately pulled into a carwash that was two or three businesses away from the gas station. He observed two people inside the Jeep. Detective Wall notified his team of flex officers of his location, and they advised that they were en route. He pulled into a parking lot near the carwash to wait for his team and observe the white Jeep. He said that the Jeep pulled up next to a pay phone in the carwash lot and then parked in one of the carwash bays. Detective Wall said that he lost sight of the Jeep at that point, so he drove into the carwash lot and parked behind the Jeep. He saw two men standing nearby and approached them, explaining to them that he wanted to talk to them about a situation. Detective Wall recalled that the two men were the defendant and his co-defendant, Dandra Young. He said that the men told him that they had just driven into town from Knoxville and were not involved in the robbery.

Detective Wall said that another officer arrived and asked co-defendant Young for permission to search the Jeep because Young said that he was the driver and had the keys. The defendant and Young also gave consent for the officers to search their persons. Detective Wall found two purses inside the Jeep that matched the descriptions of the victims' property. He said that one of the purses contained a checkbook that had one of the victim's names on it. Detective Wall said that he and the other officer detained the defendant and Young. He testified that co-defendant Deandre Dowell walked up to them and told the officers that he had been with the defendant and Young. Detective Wall said that he was surprised when Dowell approached them because he did not know a third person was in the area. He detained Dowell, as well, and placed the three men in separate police cars. Because only thirty minutes had passed since the robbery, the officers arranged for the victims to come to the carwash for a show-up identification. While they waited for the victims, the officers searched the Jeep and the area more thoroughly for other stolen property and the weapons reportedly used in the robbery. He said that a K-9 unit responded to the scene and found a silver pistol in a grassy area behind the carwash. Detective Wall testified that when the victims arrived, the officers set up an area where the victims could view the possible suspects while protecting their identities. The officers showed the suspects one at a time. Detective Wall further testified that, from the defendant's pocket, the police recovered a cell phone that matched the description given by the victims.

Following the close of proof and deliberations, the jury convicted the defendant of three counts of aggravated robbery, Class B felonies. The trial court sentenced him as a Range I, standard offender to eleven years in the Tennessee Department of Correction for each conviction, running counts one and two concurrently and count three consecutively to counts one and two for an effective sentence of twenty-two years. The trial court entered the judgment on May 27, 2009. The defendant filed an untimely motion for new trial on July 13, 2009, which the trial court denied on December 17, 2009. The defendant filed a notice of appeal on January 4, 2010, which was untimely as a result of the untimely motion for new trial.

## ANALYSIS

### I. Untimely Motion for New Trial

The State argues that the defendant has waived consideration of his issues on appeal because he untimely filed his motion for a new trial and his notice of appeal. Tennessee Rule of Criminal Procedure 33(b) provides that a motion for new trial "shall be . . . made within thirty days of the date the order of sentence is entered." This provision is mandatory, and the time for filing may not be extended. *See* Tenn. R. Crim. P. 45(b); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). The thirty-day provision is jurisdictional, and an

untimely motion is a nullity. *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The untimely filing of a motion for new trial deprives the defendant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. *Martin*, 940 S.W.2d at 569. Unlike the action this court may take following the untimely filing of the notice of appeal, we do not have the authority to waive the untimely filing of a motion for new trial. *See* Tenn. R. App. P. 4(a); *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). However, in our discretion, we may take notice of plain error which affects a substantial right of the defendant where it may be necessary to do substantial justice. Tenn. R. App. P. 36(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998).

On appeal, the defendant presents ten issues for review. Because of the untimely motion for new trial, the defendant has waived review on all issues except for those related to the sufficiency of the evidence and to sentencing. However, because the defendant alleges plain error for his first issue regarding the trial court's denial of his motion to suppress, we will conduct a plain error review of that issue in addition to the sufficiency and sentencing issues.

## II. Motion to Suppress

The defendant argues that the trial court erred by denying his motion to suppress the victims' identification of the defendant at the carwash. The defendant contends that the trial court's ruling and subsequent admission of the identification was plain error.

The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for us to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id.* at 283.

In this case, neither the motion hearing transcript nor the court's order denying the motion to suppress are a part of the appellate record. Therefore, the record does not clearly establish what occurred in the trial court, and the defendant has failed to show plain error.

### III. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions. He does not challenge the evidence that the robberies took place but rather contends that the State did not prove that he was the person who committed the robberies. Specifically, the defendant argues that there were inconsistencies in the witnesses' testimonies and that one of the police officers, Officer Mayo, identified someone other than the defendant as Darius Lee.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, aggravated robbery is the "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1).

The defendant argues that Officer Mayo misidentified the defendant and that other inconsistencies in testimony rendered the evidence of the defendant's identity as the perpetrator insufficient. However, all three victims positively identified the defendant as the first gunman who approached them. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. *See State v. Hill*, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The jury resolved any conflict in testimony in favor of the State, as was its prerogative. *See Pappas*, 754 S.W.2d at 623. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

## IV. Sentencing

The defendant argues that the trial court imposed an excessive sentence, erred in its finding of enhancement factors, erred by refusing to acknowledge the defendant's "attempt to accept responsibility for his crimes prior to trial," and erred by allowing the prosecutor to use arguments that were contrary to the record. More specifically, the defendant contends that the trial court did not consider his remorse or willingness to plead guilty as mitigating factors. The defendant also contends that the prosecutor's incorrect assertion that the defendant was on bond influenced the trial court's sentencing. The defendant presents no specific arguments regarding the enhancement factors found by the court, nor does the defendant challenge the trial court's imposition of consecutive sentences.

After a sentencing hearing at which the trial court heard from two of the victims and received the defendant's presentence report into evidence, the trial court sentenced the defendant as a Range I, standard offender to eleven years for each conviction and ran the sentence for count three consecutively to counts one and two for an effective sentence of twenty-two years. In determining the length of the defendant's sentence, the trial court found that the defendant had a previous history of criminal convictions beyond that necessary to establish the range; that the offenses involved more than one victim; that the defendant had no hesitation to commit an offense where the risk to human life was high; and that the defendant was on probation when he committed the offenses. The trial court stated that it considered the defendant's willingness to plead guilty as a mitigating factor. In support of its determination to impose consecutive sentences, the trial court found that the defendant was a dangerous offender and that he committed the offenses while on probation.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); *State v. Bonestel*, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; *Ashby*, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).

Here, the defendant presents no arguments regarding the trial court's finding of enhancement factors, and the record does not preponderate against the trial court's findings. As for the defendant's contentions regarding the trial court's unwillingness to consider the defendant's attempt to plea bargain prior to trial, the record clearly indicates that the trial court did consider the defendant's willingness to plead guilty as a mitigating factor. The defendant did not present any evidence of his remorse other than his statement in the presentence report, in which he apologized to the victims and expressed his desire to expound upon his statement at the sentencing hearing. Based on our review of the record, we cannot

conclude that the trial court erred in its consideration of mitigating factors. Furthermore, we conclude that there is no evidence to suggest that the trial court was influenced by the State's assertion that the defendant was on bond because the trial court did not rely on that information and defense counsel corrected the misinformation for the court.

While the defendant does not argue that the trial court erred by imposing consecutive sentences, we note that the trial court did not make the requisite findings to support its classification of the defendant as a dangerous offender. *See State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. *Lane*, 3 S.W.3d at 460-61; *Wilkerson*, 905 S.W.2d at 937-38. The trial court did not address the *Wilkerson* factors in making its sentencing determination. However, the trial court's error is harmless because the trial court also found that the defendant was on probation when he committed the offenses, and the trial court needed to find only one of the statutory criteria in Tennessee Code Annotated section 40-35-115(b) in order to impose consecutive sentences. Therefore, we conclude that any error in the trial court's sentencing determination was harmless and affirm the sentences as imposed.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE